# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **STANTON S. KREMSKY** | : CIVIL ACTION |
| v. | : NO. 16-4474 |
| **KENNETH F. KREMSKY** | : |

## MEMORANDUM

**KEARNEY, J.**  February 17, 2017

Our judicial role as gatekeepers reviewing whether a proffered expert can explain his opinions to the jury, while deferential, requires we ensure some reliable basis for this testimony before we permit admission to the jury. Financial accounting testimony is often offered to explain a variety of financial transactions but we are skeptical of third party opinions which attempt to find motives for the challenged transactions. While we will allow a qualified financial professional to catalog and describe data and bank records, we cannot allow the same professional to leap into unreliable opinions as to the import of the transactions or the motive of the parties engaging in the transactions. While qualified to read bank statements, he is not able to read minds and attribute motives to witnesses. In the accompanying Order, we grant a motion *in limine* to preclude testimony from a financial professional which reaches beyond demonstrated calculations of bank records could be introduced without the need for a third party assistance.

## I.    Background

Stanton Kremsky ("Uncle") alleges his nephew Kenneth Kremsky ("Nephew") breached fiduciary duties and committed fraudulent and negligent misrepresentation and conversion while managing the Uncle's financial, real estate, and precious metal investments.

Under our October 5, 2016 Scheduling Order, we required the parties to serve the information necessary to meet their burden of proof for expert reports no later than November 23, 2016.[1] We attached counsel for trial starting March 6, 2017.

On December 8, 2016, two weeks after our expert deadline, Uncle moved for an "uncontested"[2] thirty day extension of the discovery, settlement conference, and dispositive motion deadlines. We granted Uncle's motion and ordered all fact and expert discovery served, noticed, and completed by January 16, 2017.[3] We ordered summary judgment and *Daubert* motions filed by February 1, 2017 with all other obligations in our October 15, 2016 Scheduling Order remaining in effect.

On December 30, 2016, Uncle timely served his proffered expert Brad Ryden's Rule 26 disclosure of his anticipated lay or expert testimony describing the financial records produced in discovery. His report summarized misappropriations, Nephew's "apparent misappropriations" and "other possible misappropriations" into five categories (1) "transfers, checks, and purchases"; (2) "ATM Withdraws"; (3) "rare liquor purchases"; (4) "unknown withdraws, checks, and purchases"; and, (5) "credit cards and ACH payment details."[4] Mr. Ryden then analyzed Nephew's motives to misappropriate Uncle's funds under the Association of Certified Fraud Examiner's "fraud triangle" concept.

Discovery closed January 16, 2017. The parties did not agree to allow Uncle to produce a supplemental expert report after discovery closed. On January 26, 2017, Nephew moved to exclude Mr. Ryden's December 30, 2016 expert report. On February 1, 2017, Nephew moved for summary judgment based in large part on defects in Mr. Ryden's December 30, 2016 expert report.

On February 7, 2017, over three weeks after the discovery close and five days after Nephew moved for summary judgment, Uncle produced a post-discovery "supplemental" expert report. Uncle argues Nephew's motion *in limine* to exclude Mr. Ryden's December 30, 2016 expert report is mooted by Mr. Ryden's February 6, 2017 Supplemental Report.

**A. Analysis**

Today, we address only the admissibility of Mr. Ryden's December 30, 2016 expert disclosures under *Daubert*. We will address the admissibility of Mr. Ryden's February 6, 2017 supplemental expert report after Uncle timely responds to Nephew's motion *in limine* to strike it considering the prejudice to the parties.[5]

Mr. Ryden's December 30, 2016 disclosures, in large part, categorize and add financial transactions but lack an admissible expert opinion. We exclude it under *Daubert* because Mr. Ryden's mere calculations are not expert opinions and Mr. Ryden's "fraud triangle" method is unreliable. Fed. R. Evid. 702 imposes a "gatekeeping" obligation on us to "ensure that any and all scientific testimony…is not only relevant, but reliable."[6] Our Court of Appeals held Rule 702 "embodies a trilogy of restrictions on expert testimony: qualification, reliability, and fit."[7]

We focus on the lack of reliable opinions in Mr. Ryden's December 30, 2016 disclosures.[8] Expert disclosures satisfy the reliability prong if the expert's technique in formulating his opinion is reliable.[9] "In contrast, if an expert opinion is based on speculation or conjecture, it may be stricken."[10] An expert's opinion does not rest on good grounds where he simply relies on the data provided by his client without independent verification.[11]

Mr. Ryden's report never reaches an opinion. Instead he reports on deposition testimony and bank records. While Uncle argues the December 30, 2016 expert testimony is admissible under *Daubert*, he also concedes when Mr. Ryden later issued his February 6, 2017 supplemental

3

report "he had sufficient data so that his opinions are no longer qualified with words such as 'apparent' or 'possible'...[his] conclusions are stated within a reasonable degree of accounting certainty. This renders a number of Nephew's argument...moot."[12] Today's issue is whether Mr. Ryden can testify based on his qualified accounting conclusions in his December 30, 2016 disclosures. We find he cannot.

### 1. Summary of potential misappropriated funds lacks an opinion.

Mr. Ryden's December 30, 2016 disclosures "summarize the *potential* misappropriated funds into five categories." Mr. Ryden identifies Nephew's alleged misappropriations in each category but he does not reach an opinion as to any category but rather focuses on partial calculations. His disclosures do not require specialized skill or knowledge beside mathematics which the parties may stipulate or Uncle could testify.

In the first category, Mr. Ryden discusses transfers, checks, and purchases "related to" Nephew and his family totaling $263,318. Mr. Ryden summarizes the relevant facts and then hypothesizes Nephew made "multiple transfers with no apparent reason indicat[ing]...[Nephew] was attempting to mislead persons that were reconciling the bank accounts" and "there is a significant quantity of Visa purchases (debit card type) that appear to be for [Nephew]."[13] Mr. Ryden equivocates on his statement the checks written from the Everbank account to [Nephew]...appear to be paying bills" when in the footnote he adds "we cannot completely confirm that [Nephew] was the beneficiary of these expenditures, we are classifying them as unknown as this time."[14] We finish the first category, without a reliable opinion, unsure if Mr. Ryden's opinion is Nephew misappropriated $263,318 or some lesser number based on the unknown expenditures identified by Mr. Ryden. These are accounting calculations, not expert opinions. We have no ability to find these conclusions are reliable.

4

In the second category, "ATM Withdraws", Mr. Ryden cites $37,917 in "questionable ATM transactions that involve [Nephew]" but does not explain a basis for questioning these transactions other than imputing ill motive. He simply recites data entries and does not provide a reliable opinion of any wrongdoing.[15]

In the third category, "rare liquor purchases", Mr. Ryden identifies $44,652 in rare liquor purchases from the parties' joint bank account but never identifies who, in his opinion, made the purchases.[16] Even if he did so, these are accounting calculations, not expert opinion as to any deviations by Nephew.

In the fourth category, "unknown withdraws, checks, and purchases", Mr. Ryden does not include a misappropriated funds estimate and notes Uncle "may be able to assist in classifying these withdraws as personal expenses or expenses that he is not responsible for."[17] In sum, the fourth category does not contain a reliable opinion regarding Nephew's conduct other than calculations.

In the fifth category, "credit cards and ACH payment details", Mr. Ryden comes to the unreliable conclusion "$38,879 of expenditures from September 2014 through July 2015 from the Everbank accounts….appear to be related to [Nephew]."[18] At best, this is a calculation but there is no reliable basis to find these transactions are related to Nephew. He cannot read Nephew's mind.

Besides avoiding an expert opinion, Mr. Ryden gives us no "inkling as to the standards controlling" his review to assess the reliability of his methods to impute some form of misconduct by Nephew.[19] Under *Daubert's* reliability prong, another expert would need to understand Mr. Ryden's method to "review the standards controlling the technique's operation in an attempt to reproduce the results originally generated."[20] Another expert would have no idea

5

the method Mr. Ryden used to assess his results and we cannot find his report reliable under *Daubert*.

### 2. Mr. Ryden's "fraud triangle" method lacks reliability.

At best, Mr. Ryden's December 30, 2016 disclosures offer an accounting of Nephew's checks and withdrawals, the existence of which are largely undisputed. In an attempt to bolster these categories into an expert opinion regarding some form of financial misconduct, Mr. Ryden relies on the as-yet unaccepted "Fraud Triangle" to impermissibly establish Nephew's motive to allegedly misappropriate Uncle's funds.

The "fraud triangle" is a concept discussed by the Association of Certified Fraud Examiners. Their website explains "[t]he fraud triangle is a model for explaining the factors that cause someone to commit occupation fraud. It consists of three components which, together, lead to fraudulent behavior."[21] The "fraud triangle's" three components are "perceived opportunity", "rationalization", and "perceived unshareable financial need/pressure."[22]

Mr. Ryden suggests Nephew satisfies the opportunity and pressure elements of the "The Fraud Triangle." To examine if Nephew "perceived" and "rationalized" something is an inquiry into his subjective beliefs and impermissible expert testimony. "An expert witness cannot speak to the subjective belief of a [party]..." because "[s]uch testimony amounts to little more than [a] 'subjective belief or unsupported speculation.'"[23] Mr. Ryden's attempt to opine on Nephew's state of mind is not permitted under Rule 702.

Uncle does not cite a case where an expert touting this "fraud triangle" has been permitted to opine as to motive. We found only two courts addressing this concept touted by a purported expert. A district court recently excluded expert testimony on the "fraud triangle" as unreliable because the "theory is untested and does not have a known rate of error or objective

6

controls."[24] The court also found the "fraud triangle" to use improper character evidence and any probative value of the test is far outweighed by the danger of unfair prejudice.[25] The court noted although the "fraud triangle" theory existed for fifty years, it could not locate a court admitting "fraud triangle" expert testimony.[26] In 2005, a Utah appellate court affirmed a trial court's exclusion of the "fraud triangle" expert testimony because it also failed to "locate even a single case in which 'fraud triangles' theory has been adopted as a reliable scientific method" and the "'fraud triangle' testimony's prejudicial effect would outweigh any probative value."[27]

We also decline to allow Mr. Ryden's "fraud triangle" analysis to support a proffered expert's speculative testimony as to Nephew's motives. The "fraud triangle" relies on speculation based on improper character evidence and comments on Nephew's state of mind. There is no reliability to his testimony regarding "The Fraud Triangle." Rather than assisting the jury, Mr. Ryden's discussion of Nephew's conduct in the context of this speculative motive will mislead the jury and supplant its role. Mr. Ryden cannot opine as the Nephew's motives.[28] He cannot opine on Nephew's state of mind. We exclude Mr. Ryden's "fraud triangle" opinions.[29]

### C. Conclusion

We preclude Mr. Ryden's testimony purporting to opine on the import of calculations partially described in his December 30, 2016 disclosures. He may catalog financial entries and offer a calculation of numbers but cannot opine as to their origin or suggest their disposition. Under *Daubert*, because Mr. Ryden does not explain his method and reaches opinions based on his speculative views of the Nephew's pressures and motives, he does not reach an expert opinion, and his use of the "fraud triangle" method is unreliable and impermissibly comments on Nephew's state of mind. Accordingly, other than reporting the data otherwise available in discovery, Mr. Ryden may not testify consistent with his December 30, 2016 disclosures.

7

¹ ECF Doc. No. 14.

² Nephew disputes Uncle's describing the motion as "uncontested" because Nephew represents Uncle never asked his permission before filing the motion.

³ ECF Doc. No. 23.

⁴ ECF Doc. No. 38-1 at 5.

⁵ ECF Doc. No. 57.

⁶ *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).

⁷ *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (*citing In re Paoli Railroad Yard PCB Litigation*, 35 F.3d 717, 741-43 (3d Cir. 1994)) (*Paoli II*) (footnote omitted).

⁸ We find Mr. Brad R. Ryden is qualified to opine on forensic accounting issues.

⁹ *See Fedorczyk v. Caribbean Cruise Lines, Ltd.*, 82 F.3d 69, 75 (3d Cir. 1996)(*citing In re Paoli R.R. Yard PCB Lit.*, 35 F.3d 717, 741 (3d Cir. 1994).

¹⁰ *Id.* (*citing* 1 MCCORMICK ON EVIDENCE, § 13, at 56 n.15 (John William Strong, ed.1992)).

¹¹ *See Legendary Art, LLC v. Godard*, No. 11-0674, 2012 WL 3550040 at *4 (E.D. Pa. August 17, 2012)(excluding expert testimony which relied solely on a business plan prepared by plaintiff).

¹² ECF Doc. No. 55 at 7.

¹³ ECF Doc. No. 38-1 at 6.

¹⁴ *Id.*

¹⁵ *Id.* at 7.

¹⁶ *Id.*

¹⁷ *Id.* at 8. Uncle employed Mr. Ryden to write this expert report so this information should have been relatively easy to gather from the Uncle.

¹⁸ *Id.*

[19] *Elcock v. Kmart Corp.*, 233 F.3d 734, 747 (3d Cir. 2000).

[20] *Id.*

[21] Association of Certified Fraud Examiners, The Fraud Triangle, (Feb. 16, 2017), http://www.acfe.com/fraud-triangle.aspx.

[22] *Id.*

[23] *U.S. Fire Ins. Co. v. Kelman Bottles LLC*, No. 11-891, 2014 WL 3890355 at *6 (W.D. Pa. August 8, 2014) (*quoting In re Paoli*, 35 F.3d at 742).

[24] *Broyles v. Cantor Fitzgerald & Co.*, No. 10-857, 2016 WL 3251448 at *3 (M.D. La. June 13, 2016).

[25] *Id.*

[26] *Id.*

[27] *Haupt v. Heaps*, 131 P.3d 252 (Ut. App. 2005).

[28] *See Kelman Bottles LLC*, 2014 3890355 at *6.

[29] *See Broyles*, 2016 WL 3251448 at *3.