## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **STANTON S. KREMSKY** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 16-4474** |
| | : | |
| **KENNETH F. KREMSKY** | : | |

## MEMORANDUM

**KEARNEY, J.**                                                        **November 21, 2017**

We rely upon juries to evaluate credibility of witnesses and return verdicts based solely on the evidence. This Court particularly treasures the jury's collective wisdom when, after presented with days of competent evidence vetted through several pre-trial motions in a complex financial fraud, conversion and fiduciary duty claim brought by an uncle against his nephew, it unanimously decides to believe the uncle in part. Following days of conflicting fact and expert testimony, our jury returned a split verdict parsing through liability on the uncle's four claims, awarding specific compensatory and punitive damages for three of his four claims and deciding whether recovery on the three claims should be barred by the statute of limitations. As is the nature of our adversarial system, one side may be more disappointed than the other. The disappointed party finds it hard to believe a jury could make findings so contrary to their arguments. Disappointed parties now represented by new appellate counsel seek judgment, a new trial or reduced punitive damages. Their arguments challenge the jury's considered fact findings and attempt to craft a pre-trial stipulation as to ownership of certain properties never asked to be shown to the jury. We find no basis to usurp the jury's considered verdict. Both parties had ample opportunity to present a case and one side's disappointment in the jury's fact findings does not warrant setting aside the verdict, ordering a new trial or reducing damages.

## I.    Evidence presented to the jury.

Stanton Kremsky ("Uncle") is a California radiologist who sought financial and investment assistance after a former girlfriend stole his savings.[1]  Uncle met with his brother and his three nephews, including his nephew Kenneth Kremsky ("Nephew"), and his brother recommended the Uncle ask the Nephew to manage some of his investments.[2]  Nephew is not a stockbroker or investment advisor.  He is an accountant by trade who admittedly has some knowledge in buying and selling securities, real estate and other valuables on his own account.  Uncle and Nephew enjoyed a close personal familial relationship before the unfortunate discoveries leading to our jury trial.

Uncle and Nephew reached an informal agreement Nephew would begin managing some of Uncle's investments in 2004.[3]  During the first five years, their practice involved Nephew describing an investment opportunity to Uncle and Uncle would give Nephew the funds to invest.[4]  Nephew did not provide Uncle with statements tracking the investments nor did Uncle ask or expect statements because he "totally trusted" Nephew.[5]

Later in their investment relationship, Nephew opened investment accounts in Uncle's name and gained direct access to Uncle's existing accounts to "streamline" investments made on Uncle's behalf.[6]  Uncle believed, based on Nephew's representations, he invested in real estate, stocks, and precious metals. [7]  Uncle did not doubt Nephew when he said Uncle's investments were "doing great" and "making lots of money."[8]

In September 2015, Uncle needed more funds for his defined benefit plan and discovered suspicious withdrawals and underfunded accounts.[9]  Uncle questioned Nephew demanding account information and asset inventories.[10]  Unhappy with Nephew's inability to account for missing funds and investments, Uncle sued Nephew alleging he breached a fiduciary duty and

2

committed fraudulent misrepresentation, negligent misrepresentation, and conversion while managing some of the Uncle's financial, real estate, and precious metal investments.

After four days of trial, the jury returned a unanimous verdict finding Nephew: (1) committed fraudulent misrepresentation awarding $600,000 in compensatory damages and $5,000 in punitive damages; (2) committed negligent misrepresentation awarding $110,000 in compensatory damages; and, (3) committed a breach of fiduciary duty awarding $29,772.99 in compensatory damages and $5,000 in punitive damages.[11] The jury found no evidence of conversion.[12] As to each of the claims for which it awarded damages, the jury found Nephew did not prove Uncle should have discovered the Nephew's conduct within the statute of limitations.[13]

## II. Analysis

Nephew moves for judgment as a matter of law on three grounds, moves for new trial on three grounds, and moves to vacate the jury's award of punitive damages. Nephew moves for judgment as a matter of law on Uncle's fraudulent misrepresentation claim because we questioned the strength of Nephew's Rule 50 motion at the close of Uncle's case. Nephew also moves for judgment as a matter of law on Uncle's negligent misrepresentation claim arguing there is no evidence of negligent misrepresentations. Nephew moves for judgment as a matter of law on Uncle's breach of fiduciary duty claim arguing the adduced evidence did not show a fiduciary relationship under Pennsylvania law.

Nephew argues a new trial is required on the jury's finding Uncle's claims tolled under Pennsylvania's discovery rule because evidence showed Uncle remained deliberately ignorant of his possible claims. Nephew seeks new trial based on our admission of Brad Ryden's expert report and testimony because Uncle untimely disclosed it. Nephew also moves for new trial

3

arguing Uncle's proposed damages calculation failed to credit Uncle with fifty percent ownership of certain properties and used the appraisal price of precious metals, not their purchase price.

Nephew also moves to vacate the jury's award of punitive damages on Uncle's fraudulent misrepresentation and breach of fiduciary claims "for the same reasons [we] did not allow the jury to consider whether to award punitive damages on [Uncle's] claim for conversion."[14]

## A. We deny Nephew's motion for judgment as a matter of law.

Nephew moves for judgment as a matter of law under Fed. R. Civ. P. 50 for three reasons. We may grant a motion for judgment as a matter of law, "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability."[15] In considering Nephew's motion, we cannot "weigh the evidence, determine the credibility of witnesses, or substitute [our] version of the facts for the jury's version."[16]

### 1. The jury's finding of fraudulent misrepresentation is supported by evidence.

The jury heard evidence supporting its finding Nephew fraudulently misrepresented his investment activities on Uncle's behalf. The jury can find fraudulent misrepresentation where there is evidence the Nephew made a material representation to Uncle and: (1) Nephew knew the falsity of representation or recklessly disregarded the true of misrepresentation; and, (2) intended to mislead Uncle into relying on the representation.[17] There must be evidence Uncle justifiably relied on Nephew's misrepresentation and suffered injury because his reliance.[18]

The jury heard evidence Nephew requested funds from Uncle and misrepresented the funds were for Uncle's real estate investments when Nephew used the funds for his own personal use or to purchase real estate in Nephew's name only. For example, on May 12, 2008, Nephew

4

asked Uncle to transfer $40,000 into the Everbank account and represented it was for a real estate purchase in Ocean City, New Jersey as an investment for Uncle.[19] Nephew, however, did not purchase any real estate in Ocean City, New Jersey for Uncle.[20] Nephew used Uncle's funds to purchase a condo (B117) but testified the Uncle had no ownership interest in the condo.[21]

On November 2, 2010, Nephew asked Uncle to transfer $40,000 for a real estate purchase and some closing costs as an investment.[22] Nephew used Uncle's funds to pay his home equity line of credit on the B117 condo in which Uncle had no ownership interest.[23] Nephew also purchased a condo (B123) with funds from the account he shared with his Uncle but testified Uncle had no ownership interest in the condo.[24] Nephew did not put Uncle's name on the deeds of any properties he purchased in Atlantic City, New Jersey.[25] Uncle never received income from any of the Atlantic City properties purchased as investments by the Nephew.[26]

Nephew also asked Uncle for access to Uncle's Chase Bank accounts to "streamline" the investing process and "make a larger profit" for Uncle.[27] Uncle saw money leaving the Chase account but "knew money was going out for investments and for this strategy."[28] Uncle totaled Nephew made $640,000 in withdrawals from his Chase account in one year with no corresponding investment on Uncle's behalf.[29] Uncle never gave Nephew permission to use his money for Nephew's personal expenses, to pay his credit cards, or to purchase his vehicles.[30]

Nephew represented he would open investment accounts for Uncle and based on Nephew's representation Uncle regularly deposited money into each account which Nephew did not use to invest on Uncle's behalf.[31]

For example, Uncle testified Nephew represented to him he opened up an Everbank account in Uncle's name for his investments.[32] Uncle did not know Nephew opened the Everbank bank account in both Uncle and Nephew's names as a joint account and did not give

5

Nephew permission to put Nephew's funds into the account.[33] Uncle did not have an ATM card for the account, did not receive monthly statements, and had issues accessing the account until 2015.[34] During this time period, Nephew told Uncle, "[o]ur investments are doing great. We're making lots of money. Everything is fine" and, at another point, told Uncle he made him a $93,000 profit.[35]

While Nephew represented the Everbank account was solely Uncle's investments, Nephew withdrew a total of $37,000 from the account over a one year period.[36] Nephew paid his doctor with funds from the Everbank checking account.[37] Nephew wrote a check for $30,000 from the Everbank checking account to his fourteen year old daughter.[38] Nephew wrote a check from the Everbank checking account for $1,500 as the down payment to the disc jockey for his son's bar mitzvah celebration.[39] Nephew used $6,900 from the Everbank checking account to purchase a vehicle then used $15,000 from the same account to lease another vehicle.[40]

Nephew also represented to Uncle he opened an Ironbeam brokerage account for Uncle's future and options trading.[41] Uncle did not give Nephew permission to open the Ironbeam account as a joint account or deposit Nephew's money into the account.[42] Uncle never knew Nephew took the steps because Nephew had the monthly statements sent to himself.[43]

Nephew requested $15,000 from Uncle's Ironbeam account and deposited the check in his personal checking account.[44] The jury could disbelieve Nephew's testimony Uncle knew of the withdrawal and signed the check himself via fax.[45] Nephew then made the same request to Uncle's Ironbeam account for $8,000 and deposited the check with both his and Uncle's signatures into his personal account.[46] Nephew then made a third same request, this time for $7,000, also signed by Uncle and Nephew and deposited into Nephew's personal account.[47]

6

Uncle never gave Nephew permission to sign checks from the account.[48] Uncle believed Nephew's representation the Ironbeam account was for Uncle's investments.[49]

Nephew also abused his access to Uncle's funds to purchase $44,000 of rare alcohol as an investment but Uncle never received the rare alcohol bottles for investments.[50]

Nephew argues we should grant judgment as a matter of law on Uncle's fraudulent misrepresentation claim because of questions we to Uncle's counsel during oral argument on Nephew's Rule 50 motion about the sufficiency of his evidence based on our recollection. Nephew did not address Uncle's counsel argument Nephew made affirmative misrepresentations about what he planned to do with Uncle's money.[51] Post-trial study of the trial transcripts confirm Uncle adduced evidence for the jury to find Nephew fraudulently misrepresented to Uncle his funds would be used to benefit Uncle's investments and instead, Nephew used the funds for his own personal benefit.

### 2. The jury's finding of negligent misrepresentation is supported by the evidence.

Nephew also moves for judgment on Uncle's negligent misrepresentation claim arguing Uncle adduced no evidence Nephew made negligent misrepresentations. The jury can find negligent misrepresentation based on evidence Nephew misrepresented a material fact either knowing its falsity, without knowledge of its truth or falsity, or ought to know its falsity and which he intended the Uncle to rely on.[52] There must also be evidence Uncle justifiably relied on Nephew's misrepresentation and suffered injury because of his reliance.[53]

Uncle testified Nephew purchased precious metals on Uncle's behalf and either shipped them or brought them in person to Uncle.[54] An appraiser, John Woodlock, testified he knew the coins were fake because "[i]t was obvious to me just be looking at them."[55] Mr. Woodlock also testified the coins, if real, would be worth $115,515.25.[56] The jury heard Nephew testify he

7

routinely purchased precious metals for investments and the jury could find Nephew ought to have known the coins he purchased were fake.[57]

There is evidence for the jury to find Nephew misrepresented the genuine nature of the precious metals he purchased using Uncle's funds for Uncle's investments and caused harm to the Uncle.[58]

### 3. The jury's finding of breach of fiduciary duty is supported by the evidence.

Nephew moves for judgment on Uncle's breach of fiduciary duty claim arguing the evidence did not show a fiduciary relationship. Under Pennsylvania law, Uncle can prove a fiduciary relationship exists where "the relative positions of the parties is such that one has the power and means to take advantage of, or exercise undue influence over, the other."[59] Whether a fiduciary relationship exists is "necessarily fact specific .... [f]amily relationships or close personal friendships, while also not dispositive of the existence of a confidential relationship, have also often played significant roles in particular determinations."[60]

Uncle described himself as a "fiscal idiot" who lost money on previous investment ventures.[61] After a family meeting in 2004, Uncle agreed Nephew would take "on the task of managing [his] financial affairs."[62] From 2004 until 2015, Nephew told Uncle, "[o]ur investments are doing great. We're making lots of money. Everything is fine."[63] Uncle "put full faith in what [Nephew's] statements and actions were."[64] Uncle also testified he did not ask Nephew questions because he "thought he was doing the right this by [him]. [Nephew] said he was depositing it in my accounts and I assumed he was doing so."[65] At some point during the investment relationship, Nephew told Uncle he made him a $93,000 profit.[66] The jury heard three days of testimony, including Nephew's very different account, and determined based on

8

evidence and their credibility evaluation a fiduciary relationship existed between Uncle and Nephew.

Uncle wanted to fund a defined benefit plan for retirement. Uncle testified he and Nephew worked with a pension fund administrator to establish his defined benefit plan and he needed to contribute $241,000 to meet the maximum contribution threshold.[67] Nephew told Uncle he would transfer $29,000 from his Chase account along with money from the brokerage accounts and precious metals investments to meet the threshold.[68] Nephew represented to the Uncle he completed the transfer of the $29,000.[69]

Nephew never deposited the $29,000 into the Uncle's defined benefit plan.[70] Instead, Nephew told Uncle he would wire $29,000 from the joint account to fund Uncle's defined benefit plan.[71] Nephew placed $29,779.56 in a joint account and then transferred $29,779.56 back into his account, never funding the defined benefit plan for Uncle's retirement.[72] When Uncle inquired why Nephew did not fund the defined benefit plan and asked for the location of the $29,000, Nephew told him he did not know what happened and would look it up, even though Nephew transferred the $29,779.56 to his personal account.[73] Uncle then asked again and Nephew told him he transferred the money to Uncle's account and "nothing happened."[74] Nephew later told Uncle the money was not transferred due to "glitch" in the bank's system and Nephew planned to complain to the FDIC about the bank's glitch.[75] The jury awarded $29,772.99 on Uncle's breach of fiduciary duty claim, the exact amount Nephew placed in his personal account instead of Uncle's defined benefit plan.

Nephew argues we should disturb the jury's credibility findings based a Pennsylvania Supreme Court case decided after our trial. In *Yenchi v. Ameriprise Financial, Inc.*, an insurance agent with a life insurance company cold-called a married couple about their finances.[76] The

9

insurance agent met with the couple twice and reviewed their disability policy and told them it was a good product.[77] At their next meeting, the insurance agent presented a financial management proposal to the couple for which they paid him \$350 to prepare.[78] The couple followed the insurance agent's recommendations including cashing out their current life insurance policies and using the proceeds to buy his recommended whole life insurance policies.[79] Several years later, the couple had their portfolio reviewed and discovered the whole life insurance policy recommended by the insurance agent was "underfunded, destined to lapse, and that additional premiums beyond those allegedly represented by [the insurance agent]."[80] The couple sued the insurance agent and his employers alleging breach of fiduciary duty among other claims.[81] The trial court held the "no fiduciary duty arises between an insurance agent and a policyholder unless the policyholder delegates decision-making control" to the agent and the evidence showed the couple made their own financial decisions.[82]

The Pennsylvania Supreme Court affirmed finding the couple did not adduce evidence to create a genuine issue of material fact as to whether a fiduciary relationship existed.[83] The supreme court noted while couple argued they lacked financial and legal sophistication, they offered no supporting testimony.[84] The couple also argued because they paid a fee for the insurance agent's proposal, they were "justified in believing that the advice was being provided in their best interests, and was more than an ordinary's arm's-length transaction involving the purchase of insurance" but did not testify they had a close, personal relationship with the insurance agent or he told them he acted only in their best interests.[85] The Pennsylvania Supreme Court held the couple could not establish a fiduciary relationship because the only adduced evidence is they paid for and relied on the insurance agent's specialized skill.[86]

10

The Nephew's conduct towards Uncle is much different. Uncle testified as to sharing both a familial bond and a personal friendship with Nephew, including traveling to Florida to see the Phillies in Spring Training. In *Yenchi*, the insurance agent cold-called the couple and had only a business relationship. Uncle also testified he is a "fiscal idiot" and agreed Nephew would take "on the task of managing [his] financial affairs" after he made poor investment decisions on his own.[87] Uncle also testified the relationship lasted over ten years throughout which Nephew reassured Uncle "[o]ur investments are doing great," unlike in *Yenchi*, where the couple offered no evidence the insurance agent lead them to believe he was acting in their best interest and their relationship only consisted of a few in-person or telephone meetings.[88] Uncle also testified he had "full faith" in Nephew as a family member so he did not need to question Nephew's investment actions. In *Yenchi*, the supreme court specifically distinguished the relationship from a family or personal relationship because "[f]amily relationships or close personal friendships, while also not dispositive of the existence of a confidential relationship, have also often played significant roles in particular determinations."[89] The Pennsylvania Supreme Court's decision did not fundamentally change how we determine if a confidential relationship exists. Uncle adduced evidence which the jury found credible of Nephew "exercis[ing] undue influence over" him creating a fiduciary duty.[90]

We deny judgment as a matter of law as the jury heard evidence to find Nephew owed a fiduciary duty to Uncle and breach his duty.

11

**B.    We deny Nephew's motion for new trial.**

Nephew moves for a new trial on three grounds. We grant a new trial "only where the 'great weight' of evidence cuts against the verdict and 'where a miscarriage of justice would result if the verdict were to stand.'"[91]

### 1.    Evidence supports the jury's specific finding the discovery rule tolled the statute of limitations.

Nephew argues a new trial is required on Uncle's claims tolled under Pennsylvania's discovery rule because Uncle "remained willfully ignorant" of his possible claims and this should bar his claims. With the parties' consent, we asked the jury to decide this fact.

Under Pennsylvania law, "the statute of limitations begins to run when '[Uncle] knows, or in the exercise of reasonable diligence should have known, (1) that he has been injured, and (2) that his injury has been caused by another's conduct."[92] The jury's finding the discovery rule tolled the statute of limitations is supported by evidence at trial.

Uncle testified Nephew took "on the task of managing [his] financial affairs" and Nephew told Uncle, "[o]ur investments are doing great. We're making lots of money. Everything is fine."[93] Uncle also testified he saw Nephew's withdraws from his checking account and gave Nephew the funds requested to purchase real estate because he "knew money was going out for investments and for this strategy."[94] The evidence found credible by the jury is Uncle did not discover Nephew's conduct until 2015 because he believed Nephew's reassurances and trusted his investment strategy.

Nephew is asking us to override the jury's credibility determination based on our court of appeals' decision in *Blanyar v. Genova Products Inc.* In *Blanyar*, former employees sued their employer alleging they were exposed to toxic substances in at the plant and requesting medical monitoring.[95] The employees filed suit in 2015, and the employer argued the statute of

12

limitations barred their claims because they filed them more than two years after the plant closed in 2012.[96] The employees agued the discovery rule tolled the statute of limitation because they could not discover the dangers of the toxic substances within two years.[97] Our court of appeals held the discovery rule did not apply because the employees knew they were exposed to toxic substances and information about medical literature and federal regulation documented the toxic effect of these substances on health beginning in the 1970s, "well before" the discovery date.[98]

Our court of appeals' decision in *Blanyar* does not change how Pennsylvania's discovery rule applies in this case because there the employees knew they were exposed to the substance and the danger of the substance was well documented in publically available sources. Uncle's injury stemmed from his close personal relationship with his Nephew who functioned as his investment advisor, who reassured him his investments were on track and profitable while using Uncle's money for Nephew's personal pursuits. Nephew ably argued Uncle chose ignorance and failed to reasonably investigating his financial affairs to the jury in cross-examination and in closing arguments, but the jury did not credit Nephew's arguments. The jury's finding in response to a special interrogatory Uncle could not, through reasonable diligence, discover Nephew's conduct before August 15, 2014 is not against the weight of evidence and is not a miscarriage of justice.

### 2. Our admission of Mr. Ryden's expert testimony did not prejudice Nephew.

Nephew also seeks a new trial because we admitted Mr. Ryden's expert report and testimony because Uncle untimely disclosed this testimony thus prejudicing Nephew.

Nephew moved to preclude Mr. Ryden from testifying before trial based on the untimely disclosures.[99] We fully incorporate our February 22, 2017 Order-Memorandum where we weighted the four factors in deciding whether to exclude of evidence under Fed. R. Civ. P.

37(b)(2) and found Uncle's late disclosure of his expert report prejudiced Nephew but Nephew could cure the prejudice.[100] To cure the prejudice, we ordered Uncle to produce Mr. Ryden for a three hour deposition, allowed Nephew to prepare a rebuttal report, and ordered Uncle to pay Nephew's costs and attorneys for the deposition and rebuttal report.[101]

Nephew deposed Mr. Ryden and prepared a rebuttal report before trial, and he then ably cross-examined him at trial curing the prejudice.[102] Nephew argues Mr. Ryden's testimony prejudiced him because he testified Uncle suffered damages of $750,000 and the jury then awarded a substantially similar amount in its verdict. The fact the jury found Mr. Ryden's testimony credible on damages does not mean the testimony prejudiced him particularly where the Nephew deposed the expert, presented a rebuttal expert, and thoroughly cross-examined him. The belated testimony did not prejudice Nephew. We deny his motion for new trial.

### 3. Our admission of Uncle's expert report and testimony did not prejudice Nephew.

Nephew moves for new trial arguing Uncle's proposed damages calculation failed to credit Uncle with fifty percent ownership of certain properties and used the appraisal price of precious metals, not their purchase price.

Nephew never asked for a stipulation to be read to the jury about the ownership of the three Atlantic City properties. Nephew testified Uncle shared fifty percent ownership.[103] But Uncle testified he did not find his name as an owner on deeds of property owned by Nephew.[104] During trial, Nephew raised this issue to the jury by asking Uncle's expert, Mr. Ryden, why he did not account for the three properties Nephew testified he and Uncle shared fifty percent ownership. [105] Mr. Ryden testified Uncle is not on the deeds and "real estate does have to be in writing."[106] The jury chose to credit Mr. Ryden's and Uncle's testimony over Nephew's and found Uncle did not have an ownership interest in the properties.

14

Nephew argues our recognition of the parties' stipulation for the preliminary injunction overrides the jury verdict. This is incorrect. Our October 5, 2016 Order granting Uncle a partial preliminary injunction is an interlocutory order which governed the parties until the jury returned its verdict.[107] We deny Nephew's motion for new trial because the jury's factual findings are not bound by the preliminary injunction and Nephew did not request a stipulation of ownership be submitted to the jury.

Nephew also argues for a new trial because Uncle's expert, Mr. Ryden, used the appraisal price of precious metals, not their purchase price and objects to John Woodlock's testimony on the subject. Nephew cites no law to support his argument the jury must use the purchase value of precious metals, not the appraised values. Nephew did not request a jury instruction about the proper valuation for precious metals and did not raise an objection to its absence. His argument is waived.

Nephew also interjects an argument we should have precluded Mr. Woodlock's testimony. Nephew raised this objection before trial and we allowed Mr. Woodlock to testify but not mention or discuss the other appraiser in his testimony.[108] Nephew argues Mr. Woodlock only briefly reviewed the 930 precious metal items and relied entirely on the other appraiser's valuation. Nephew raised the issue to the jury during Mr. Woodlock's testimony numerous times. The jury could credit Mr. Woodlock's testimony the coins were obviously fake on their face and many individual items were the same type of coin making it easier and faster to appraise.[109] Nephew challenged this testimony. The jury disagreed.

We deny a new trial on the basis the jury may have used the appraised value of precious metals, not the purchase price and we properly admitted Mr. Woodlock's testimony.

15

## C. The jury's award of punitive damages is proper.

The jury awarded punitive damages against Nephew after finding breach of fiduciary duty and fraudulent misrepresentation. As discussed, the jury heard evidence Nephew took Uncle's money meant to fund his retirement and purchased vehicles, real estate, pay for a disc jockey for his son's bar mitzvah, paid $30,000 to his pre-teen daughter, and purchased $1,000 plus bottles of rare liquor for himself totaling $44,000. Based on the evidence the jury could find Nephew's conduct outrageous because it is "malicious, wanton, willful, oppressive or showed reckless indifference" to Uncle's interests. We deny Nephew's request to vacate punitive damages.[110]

## III. Conclusion

We deny Nephew's motion for judgment as a matter of law because the jury heard sufficient evidence to amply support its finding of fraudulent misrepresentation, negligent misrepresentation, and breach of fiduciary duty. We deny Nephew's motion for new trial because the jury's verdict is not against the weight of the evidence. We also deny Nephew's motion to vacate punitive damages because the jury heard sufficient evidence to find Nephew's conduct outrageous.

---

[1] N.T. March 8, 2017, pp. 62:1-6; 64:19-66:1.

[2] *Id.* at pp. 66:7-67:22.

[3] *Id.* at p. 67:13-22.

[4] *Id.* at pp. 68:17-69:5.

[5] *Id.* at pp. 69:3-70:9.

16

[6] N.T. March 7, 2017, p. 103:2-24.

[7] N.T. March 8, 2017, pp. 84:14-85:14; 101:16-19.

[8] *Id.* at pp. 84:14-85:14; 101:16-19.

[9] *Id.* at pp. 76:3-80:12.

[10] *Id.* at pp. 79:3-85:12.

[11] ECF Doc. No. 93.

[12] *Id.*

[13] *Id.*

[14] ECF Doc. No. 131 at 3.

[15] *Mancini v. North Hampton County*, 836 F.3d 308, 314 (3d Cir. 2016) (quoting *Lighting Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993)).

[16] *Id.* (quoting *Lighting Lube*, 4 F.3d at 1166).

[17] *See Bouriez v. Carnegie Mellon University*, 585 F.3d 765, 771 (3d Cir. 2009) (quoting *Overall v. Univ. of Pa.*, 412 F.3d 492, 498 (3d Cir. 2005) and *Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994)) (Under Pennsylvania law, a fraudulent misrepresentation claim has six elements: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.").

[18] *See id.*

[19] N.T March 8, 2017, p. 95:14-17; 96:5-7.

[20] *Id.* at p. 97:2-5.

[21] N.T. March 6, 2017, pp. 187:4-188:25.

[22] N.T. March 8, 2017, pp. 98:23-99:7.

[23] N.T. March 6, 2017, pp. 202:4-204:24.

[24] *Id.* at pp. 177:23-179:6.

[25] N.T. March 8, 2017, p. 147:13-18.

[26] N.T. March 7, 2017, p. 51:13-19; N.T. March 8, 2017, p. 99:18-21.

[27] N.T. March 8, 2017, p. 103:1-24.

[28] *Id.* at p. 105:10-11.

[29] *Id.* at p. 114:12-16.

[30] *Id.* at p. 165:5-8.

[31] *See* N.T. March 7, 2017, p. 103:2-12.

[32] N.T. March 8, 2017, p. 70:20-71:11.

[33] *Id.* at p. 72:3-6.

[34] *Id.* at pp. 73:22-76:3.

[35] N.T. March 6, 2017 p. 154:15-20; N.T. March 8, 2017 p. 101:8-19.

[36] N.T. March 6, 2017, p. 208:5-18.

[37] *Id.* at p. 234:4-16.

[38] *Id.* at p. 237:9-18.

[39] *Id.* at pp. 242:16-242:7.

[40] *Id.* at pp. 244:14-245:7.

[41] N.T. March 8, 2017, p. 87:15-22; 90:15-16.

[42] *Id.* at p. 88:3-12.

[43] *Id.* at p. 87:15-22; 90:15-16.

[44] N.T. March 7, 2017, pp. 20:2-23:12.

[45] *Id.* at pp. 20:2-23:12.

[46] *Id.* at pp. 25:4-26:19.

[47] *Id.* at pp. 27:4-29:4.

[48] N.T. March 8, 2017, p. 91:17-19.

[49] *Id.*

[50] N.T. March 7, 2017, p. 13:18-24; N.T. March 8, 2017, p. 160:11-22.

[51] *See* N.T. March 8, 2017, p. 273:1-8.

[52] *See Azarchi-Steinhauser v. Protective Life Ins. Co.*, 629 F. Supp. 2d 495, 502 (E.D. Pa. 2009) (quoting *Gibbs*, 647 A.2d at 890) ("In Pennsylvania, the elements of a negligent misrepresentation claim are '(1) a misrepresentation of a material fact; (2) the representor must either know of the misrepresentation, must make the representation without knowledge as to its truth or falsity or must make the representations under circumstances in which he ought to have known of its falsity; (3) the representor must intend the representation to induce another to act on it; and (4) injury must result to the party acting in justifiable reliance on the misrepresentation'").

[53] *See id.*

[54] N.T. March 8, 2017, p. 131:5-8; 135:13-21.

[55] *Id.* at p. 262:12-13 (Videotape of John Woodlock played to the jury). Deposition of John Woodlock, p. 30:15.

[56] *Id.* Deposition of John Woodlock, p. 38:11.

[57] *See e.g.*, N.T. March 6, 2017, pp. 220:2-221:5; 146:16-147:16.

[58] *See Azarchi-Steinhauser*, 629 F. Supp. 2d at 502.

[59] *Yenchi v. Ameriprise Financial, Inc.*, 161 A.3d 811, 820 (Pa. 2017).

[60] *Id.* at 821 (citing *Silver v. Silver*, 219 A.2d 659, 663 (1966)).

[61] N.T. March 8, 2017, p.164:6-9.

[62] *Id.* at p. 67:20-22.

[63] *Id.* at p. 101:8-19.

[64] *Id.* at 102:15-16.

[65] *Id.* at pp. 99:22-100:2.

19

[66] N.T. March 6, 2017, p. 154:15-20.

[67] N.T. March 8, 2017, pp. 118:18-119:24.

[68] *Id.* at pp. 117:25-118:13.

[69] *Id.* at p. 123:12-15.

[70] N.T. March 6, 207 pp. 249:2-254:16; 255:18-256:19.

[71] *Id.*

[72] *Id.*

[73] *Id.* at pp. 261:25-263:25.

[74] *Id.* at pp. 265:15-267:5.

[75] N.T. March 8, 2017, p. 127:1-4.

[76] *Yenchi*, 161 A.3d at 814.

[77] *Id.*

[78] *Id.*

[79] *Id.* at 815.

[80] *Id.*

[81] *Id.* at 815-16.

[82] *Id.* at 816.

[83] *Id.* at 819.

[84] *Id.*

[85] *Id.*

[86] *Id.* at 822-23.

[87] N.T. March 8, 2017, p.164:6-9; 67:20-22.

[88] *Id.* at p. 101:8-19.

[89] *Id.* at 821 (citing *Silver v. Silver*, 219 A.2d 659, 663 (1966)); N.T. March 8, 2017 pp. 99:22-100:2.

[90] *Yenchi*, 161 A.3d at 820.

[91] *Springer v. Henry*, 435 F.3d 268, 275 (3d Cir. 2006) (quoting *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F3d 1061, 1076 (3d Cir. 1996)(en banc)).

[92] *Blanyar v. Genova Products Inc.*, 861 F.3d 426, 432 (3d Cir. 2017) (internal citations omitted).

[93] N.T. March 8, 2017, p. 67:20-22; 101:8-19.

[94] *Id.* at p. 105:10-11.

[95] *Blanyar*, 861 F.3d at 428.

[96] *Id.* at 429.

[97] *Id.* at 430.

[98] *Id.* at 432-33.

[99] ECF Doc. Nos. 38, 45-1.

[100] ECF Doc. No. 73.

[101] *Id.*

[102] *See* ECF Doc. No. 88.

[103] N.T. March 6, 2017, pp. 173:11-174:3.

[104] N.T. March 8, 2017, p. 100:10-11.

[105] *Id.* at pp. 19:22-21:9.

[106] *Id.*

[107] *See New Jersey Hosp. Ass'n v. Waldman*, 73 F.3d 509, 519 (3d Cir. 1995) (citing *Oburn v. Shapp*, 531 F.2d 142, 149 n.18 (3d Cir. 1975)) (until a final judgment on the merits, "the findings of fact and conclusions of law made in conjunction with the preliminary injunction are indeed preliminary. As such, they do not foreclose any findings or conclusions to the contrary based on the record as developed…").

[108] *See* ECF Doc. No. 85.

[109] N.T. March 8, 2017, p. 262:12-13 (Videotape of John Woodlock's deposition testimony played to the jury). Deposition of John Woodlock, pp. 30:15; 44:6-45:21.

[110] N.T. March 9, 2017, p. 191:5-7.